# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOE DON SHERROD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-16-780-F |
| | ) | |
| WARDEN BYRD, Cimarron Correctional Facility, individually and in his official capacity; CORRECTIONS CORPORATION OF AMERICA, owners of, individually and in their official capacity, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Joe Don Sherrod (Plaintiff) filed this action using a form Pro Se Prisoner Civil Rights Complaint and asserting jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(a)(3). Doc. 1, at 1.[1] United States District Judge Stephen P. Friot has referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (C). Doc. 4.

Plaintiff sues (1) Warden Byrd, warden of the Cimarron Correctional Facility (where Plaintiff was previously housed), and (2) the owners of the Corrections Corporation of American (CCA), who contracted with the

---

[1] This report cites court filings by their electronic case filing designation and pagination; quotations are verbatim unless indicated.

Oklahoma Department of Corrections to run the Cimarron Correctional Facility (CCF). Doc. 1, at 4.

In his first claim, Plaintiff alleges Defendants[2] violated his Eighth Amendment right to be free from cruel and unusual punishment, by denying and delaying "adequate medical care." *Id.* at 9. In his second claim, he alleges "CCA/CCF failed to provide equal treatment to laws requiring prisoners receive adequate medical care . . . ." *Id.* at 7. Plaintiff alleges he has suffered a "shortened life span," "irre[f]utuable harm, pain," and seeks two million dollars in damages. *Id.* at 8. He also seeks injunctive relief, "seek[ing] an order directing CCA refrain from same conduct" (such as the alleged delaying of the provision of medical care and the filling of prescriptions). *Id.* at 7.

## I. Pro se pleadings.

The court "review[s] [Plaintiff's] pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines*, 404 U.S. at 520-21 (holding allegations of a pro se complaint "to less stringent standards than formal pleadings drafted by

---

[2] Though Plaintiff's first claim largely focuses on Defendant Byrd, he seeks relief from both Defendant Byrd and CCA, asserting "Defendants" deprived him of medical care, etc., Doc. 1, at 6, 10, 11. Liberally construing his complaint, the court addresses both claims as including both Defendants. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam).

lawyers"). However, a pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts not alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see also Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). Plaintiff's "pro se status does not entitle [him] to application of different rules." *Goldwyn v. Donahue*, 562 F. App'x 655, 659 (10th Cir. 2014) (*citing Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002)).

II. **Summary judgment standard.**

The court shall grant summary judgment "if [Defendants show] that there is no genuine dispute as to any material fact and [Defendants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering Defendants motion, the court views the facts and inferences drawn from the record "in the light most favorable" to Plaintiff. *See Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006) (citation omitted).

3

A dispute is "genuine," when viewed in this light, if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.*

To obtain summary judgment, the moving party need not affirmatively negate the nonmovant's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Rather, the moving party initially bears the burden only of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has satisfied this burden, the burden shifts to the nonmoving party to show there is a genuine issue of material fact. *Id.* at 324. The nonmoving party "may not rest upon mere allegation" in his pleading to satisfy this requirement. *Anderson*, 477 U.S. at 256. Rather, Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

## III. Factual background.

Based upon the complaint, and the Special Report[3] and the evidentiary material appended thereto, the following material facts are uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to Plaintiff.

Plaintiff was housed at CCF from September 27, 2013 through May 20, 2016. Doc. 28, at 2. In June 2015, Plaintiff sought health services for a "lump that's come up under [his] chin . . . ." Doc. 43, Ex. 2.1, at 2. Nurse Sandra Slovak, RN, examined Plaintiff on June 30, 2015, noting the large lump and Plaintiff's pain when he turned his head. *Id.* at 3. Dr. Stephen Paine examined Plaintiff on July 7, 2015, ordered various lab tests, and began Plaintiff on a round of antibiotics. *Id.* at 4-5. The lab work was conducted on July 15, 2015, and Dr. Paine reviewed the results on July 21, 2015 and ordered a CT scan. *Id.* at 6, 9-10.

On July 24, 2015, Diagnostic Imaging Associates, Inc. performed the CT scan in Tulsa, Oklahoma. *Id.* at 12-13. On July 27, 2015, Dr. Paine reviewed the results and saw Plaintiff on August 11, 2015. *Id.* at 11, 14-15. Dr. Paine ordered Plaintiff to be seen by a specialist "ASAP." *Id.* at 14. On August 20,

---

[3] The court treats the Special Report as an affidavit. *See Hall*, 935 F.2d at 1111 (explaining the role of a Special Report in summary judgment proceedings).

5

2015, Dr. Paine followed up on the specialist appointment and moved it closer "than currently scheduled." *Id*. at 16.

Dr. Jean-Maria Langley, D.O., saw Plaintiff on August 26, 2015 at the Utica Park Clinic. *Id*. at 17-20. She reviewed the CT Scans, performed a laryngoscopy, and obtained a biopsy sample. *Id*. This biopsy showed an insufficient amount of cellular material for a diagnosis. *Id*. at 21. On September 8, 2015, Plaintiff requested to see a doctor about the results and was told he had an appointment the following week. *Id*. at 22.

Plaintiff underwent another biopsy on October 15, 2015, and Lauren Palmer-Neefe, RN, and Dr. Paine, saw him that day. *Id*. at 23-26. Dr. Paine noted Plaintiff's gastroesophageal reflux disease complaints and prescribed Prilosec while awaiting the biopsy results. *Id*. at 25-26. Dr. Paine saw Plaintiff again on October 20, 2015. *Id*. at 27-28. Dr. Paine intended to follow up when he received the biopsy results and results from the ear/nose/throat clinic. *Id*. at 27.

On November 3, 2015, the biopsy results were received and identified malignant cells consistent with metastatic squamous cell carcinoma. *Id*. at 29-30. Dr. Paine reviewed the results the following day, ordered a PET scan, and Plaintiff's return to the ear/nose/throat clinic. *Id*. at 31-32.

On November 8, 2015, Plaintiff filed a request for health services complaining about facial and neck swelling and an upset stomach. *Id*. at 33.

Health Services responded he was "scheduled to see Dr. Paine 11/18" and "Routine Nurse S/C Scheduled." *Id*. On November 10, 2015, authorities transported Plaintiff for a PET scan that authorities then rescheduled, due to Plaintiff's failure to observe the "nothing per mouth" rule. *Id*. at 34. Plaintiff underwent a PET scan on November 16, 2015. *Id*. at 39.

Dr. Paine next examined Plaintiff on December 4, 2015. *Id*. at 40-41. Dr. Paine prescribed Ultram and Percogesic for neck pain and submitted an urgent request for an oncologist and biopsy surgery. *Id*. Authorization was received on December 9, 2015. *Id*. at 42.

Plaintiff submitted two requests for health services on each of December 11 & 15, 2015. *Id*. at 43-44. He sought to have his prescription for "Tramadall" filled. Health Services responded "Routine nursing visit - Note sent to pharmacy." *Id*. at 43. His second request again complained he had not received his medication. *Id*. at 44. The response was "Routine nursing visit." *Id*.

On January 7, 2016, Plaintiff visited the Hillcrest Hospital South in Tulsa to see Dr. Langley, who performed a microdirected laryngoscopy with bronchoscopy, a tonsillectomy, and biopsies of his tongue. *Id*. at 45-50. Upon his return to CCF, he remained in the medical clinic for several days receiving care. *Id*. at 53-62. He was "[r]elease[d] from medical" on January 11, 2016. *Id*. at 62. Dr. Paine also saw Plaintiff again on the next day, January 12, 2016.

7

*Id.* at 63. On January 15, 2016, Dr. Paine noted Plaintiff reported "not getting [his prescription for] Ultram." *Id*. at 66. Dr. Paine rewrote the prescription and sent it to the pharmacy. *Id*.

Plaintiff returned to the Utica Park Clinic for treatment three times before his treatment at the University of Oklahoma Medical Center began. *Id*. at 69-72. An oncology consult was recommended on January 25, 2016. *Id*. at 75. On January 22, 2016, the University of Oklahoma Medical Center reported no new patient appointment availability until March, 2016. *Id*. at 77. And, the Utica Park Clinic could no longer see Plaintiff after February 1, 2016, citing insurance issues. *Id*. at 79.

Plaintiff received chronic care follow up on February 1, 2016, an oncology consultation on February 17, 2016, and on February 18, 2016, received a referral for a near/nose/throat doctor and a radiation oncologist. *Id*. at 80-83, 85-90. Plaintiff filed a request for health services on February 21, 2016, seeking more Ultram and stronger medication. *Id*. at 93. Health Services noted "Routine Nurse S/C." *Id*.

Dr. Paine sought to "expedite" Plaintiff's treatment and "evaluation" acknowledging "delay due to scheduling." *Id*. at 95. On February 29, 2016, March 2, 2016, and March 3, 2016, CCF followed up about scheduling an outside appointment for an ENT consultation. *Id*. at 96, 99, 100. Dr. Paine

8

saw Plaintiff on February 29, 2016. *Id*. at 97-98. The dental clinic examined Plaintiff on March 7, 2016. *Id*. Ex. 2.2, at 1-4.

Dr. Paine and Jill Shelton, RN, examined Plaintiff again on March 10, 2016, noting a surgical and oncology consult were pending. *Id*. at 5-7. Dr. Paine again met with Plaintiff on March 16, 2016. *Id*. at 8-9.

Plaintiff received the offsite oncology consult on or about March 21, 2016, which recommended chemoradiation to neck and tonsil and another "PET scan (Urgent)." *Id*. at 8-11, 12-27. Dr. Paine met Plaintiff upon his return. *Id*. at 8-11. Progress notes indicate on March 22, 2016, the offsite radiation department requested Plaintiff's PET scan "be done as soon as possible," to be followed up with "35 radiation treatments . . . ." *Id*. at 29.

Dr. Paine examined Plaintiff on March 28, 2016, and Plaintiff underwent a PET scan on March 30, 2016. *Id*. at 30-36, 39. After Plaintiff submitted a Request for Health Services on March 31, 2016, complaining of ear pain, Nurse Palmer-Neefe examined Plaintiff on April, 2, 2016. *Id*. at 37-38. At the time of the exam, Nurse Palmer-Reefe noted Plaintiff stated he was "better" since his Neurontin dosage increased. *Id*. at 38.

Dr. Paine saw Plaintiff on April 4, 2016. *Id*. at 40-44. Plaintiff was fitted for a radiation shield mask on April 6, 2016 and was seen by Dr. Paine upon his return. *See id*. at 41-43.

9

Plaintiff requested a mental health appointment on April 7, 2016, and on April 14, 2016, the Mental Health Coordinator saw him and arranged for him to meet with Dr. Lorenzo Aruajo two days later. *Id.* at 45-47. Dr. Aruajo prescribed a mood stabilizer to address Plaintiff's complaints. *Id.* at 49.

Plaintiff began his treatment regimen on April 18, 2016 and completed the fifth round of chemotherapy and radiation treatment on May 20, 2016. *Id.* at 51-101, Doc. 43, Ex. 2.3, at 2-34. During his treatments, prison medical staff treated Plaintiff, documenting his complaints of swallowing difficulty, anxiety, nausea, and pain. *Id.* Ex. 2.2, at 78 (April 30, 2016), 79 (May 1, 2016), 90-99 (May 4-6, 2016), 100 (May 9, 2016). On May 19, 2016, because of Plaintiff's difficulty swallowing and holding food down, Dr. Paine and the Heath Services Administrator made an emergency request to transfer Plaintiff to a facility with an infirmary. Doc. 28, Ex. 1, at 185. Plaintiff was transferred to another facility on May 21, 2016. *Id.* at 192; Doc. 43, Ex. 3, at 5.

**IV.   Discussion.**

   **A.   Eighth Amendment standard.**

A two-prong standard governs claims of deliberate indifference to serious medical needs. To establish the objective prong of this Eighth Amendment claim, Plaintiff must show "that the deprivation at issue was in fact 'sufficiently serious.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

10

> We have said that a medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim. Moreover, a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain.

*Id.* (citations and internal quotation marks omitted).

To establish the subjective component—i.e., deliberate indifference to a substantial risk of harm—Plaintiff must show that the prison official in question acted with a "culpable state of mind." *Id.*; *Farmer*, 511 U.S. at 834, 836.

> The subjective component is satisfied if the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference. A prison medical professional who serves solely as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role.

*Mata*, 427 F.3d at 751 (alteration, omission, citations, and internal quotation marks omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (noting that deliberate indifference can be manifested "by prison guards in intentionally denying or delaying access to medical care"); *Sealock v. Colorado*,

218 F.3d 1205, 1210 (10th Cir. 2000) ("Delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm.").

With respect to Plaintiff's Eighth Amendment claim against CCA, Plaintiff must show that CCA has a custom or policy that can be said to have caused the alleged constitutional violation. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (holding that traditional municipal liability principles apply to claims brought under 42 U.S.C. § 1983 against private corporations); *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) ("[I]n order to hold CCA liable for the alleged tortious acts of its agents, [Plaintiff] must show that CCA directly caused the constitutional violation by instituting an official policy of some nature that was the direct cause or moving force behind the constitutional violations.") (internal citation and quotation marks omitted).

### B. Plaintiff's Eighth Amendment claim.

Plaintiff alleges he "sought medical care from lump on my neck in June 2015. CCF waited until October [15] to get me diagnosed . . . with cancer." Doc. 1, at 7. He suffered a "delay in surgery until Jan 7th 2016" and a "delay in after care till April 2016." *Id.* He alleges "Defendant refused to provide . . . prescribed medications," "failed to follow instructions and specific orders that were written by their own contracted surg[e]ons and specialists and instead

12

changed those instructions or/and orders either all together or intentionally delayed following those orders for months at a time." *Id.* at 10. As a result, the likelihood of success of Plaintiff's treatment diminished, his life expectancy has decreased and his quality of life diminished. *Id.*

As evidence of Defendants' ignoring or amending instructions, Plaintiff attaches a December 17, 2015 request to staff, wherein Plaintiff complained he was not receiving his prescribed medications. Doc. 1, Ex. A. A staff member responded Plaintiff received prescribed Neurontin daily, but noted Plaintiff "do[es] not go every night like [he is] supposed to." *Id.* The staff member also noted that when Plaintiff is prescribed something, "it does not mean that is what DOC or medical providers will order you." *Id.*

He also attaches the October 15, 2015 biopsy results and another request to staff (dated September 17, 2015) seeking the results of his first biopsy. *Id.* Exs. B, C. Staff responded the "results are not in yet" and that "We will attempt to obtain them . . . ." *Id.* Ex. C. Plaintiff had also submitted a September 8, 2015 request for health services seeking to consult a doctor about the results of the August 2015 biopsy and was told he was "scheduled to see the DR next week." Doc. 28, Ex. 1, at 19. Despite this indication, the next evidence of medical care appears to be another biopsy (the first being inconclusive) on October 15, 2015. *Id.* at 20-23, 26-27.

Plaintiff also attaches his March 21, 2016 radiation/oncology consultation notes, which stated "There has been some delay moving through the prison medical approvals and transfers of his status. During the last several months, the mass in the neck has grown progressively larger and more painful." Doc. 1, Ex. D, at 1. Last, Plaintiff attaches his April 20, 2106 clinical summary, indicating the diagnosis of "Cancer – Stage IVA." *Id.* Ex. E, at 1. He alleges a three-and-a-half month delay in the start of his chemotherapy and radiation treatments. Doc. 1, at 11. He alleges "documentation" and "witness testimony" will establish "such a delay was intentional . . . ." *Id.*

Regarding the same allegations against CCA/CCF and its "employees," Doc. 1, at 7, the plaintiff has not identified by name the individuals he claims are responsible for denying or delaying his medical treatment. He maintains Defendant Byrd "was aware of . . . documentation showing where several notices were submitted to him informing him of the issues plaintiff was having with the medical department . . . ." Doc. 45, at 3.

The record establishes Plaintiff had multiple contacts with medical personnel since his diagnosis. *Supra* § III. He was transported to hospitals and facilities for biopsies, CT scans, PET scans, and his chemoradiation treatment regimen. *Id.* Medical personnel saw him whenever he filed a request for health services, and he had regular contact with doctors. *Id.*; *see also* Doc. 43, Ex. 3, at 6 (Affid. of Nurse Palmer-Reese). He received mental

14

health treatment when he requested it. Doc. 43, Ex. 2.2, at 45, 47-49. Dr. Paine and/or a nurse saw him regularly as he progressed through his five rounds of chemotherapy and radiation treatments. *Id.* at 51-101. After CCF scheduled his appointments, the record indicates Dr. Paine tried to accelerate certain appointments and the receipt of a prescription. Doc. 43, Ex. 2.1, at 14; 16; 66; 95. This does not amount to an "extraordinary degree of neglect" required to satisfy the subjective component. *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

Over the course of eleven months, Doc. 43, Ex. 2.3, at 36-40, Plaintiff was prescribed and received many medications. While true he did not immediately receive each precise prescription, Defendants provide evidence that "non-formulary" prescriptions such as certain Plaintiff received (*e.g.*, Tramadol), required Regional Director approval. Doc. 43, Ex. 3, at 6 (Affid. of Nurse Palmer-Reese). Once approval is received, CCF seeks to fill the prescription through its local pharmacy—a pharmacy with limited hours. *Id.* Plaintiff does not allege this policy amounted to deliberate indifference, nor could he.

Plaintiff cannot show that any delay rose to the level of deliberate indifference. *Self*, 439 F.3d at 1232. Nor can he show the treatment he received amounted to deliberate indifference. *Compare Oxendine v. Kaplan,* 241 F.3d 1272, 1279 (10th Cir. 2001) (denying defendants' motion to dismiss where prison doctor waited at least two-weeks before diagnosing the onset of

15

gangrene and referring plaintiff to outside specialist where doctor had reattached plaintiff's finger, which presented "decaying tissue" and eventually could no longer be reattached) *with Self*, 439 F.3d as 1232. Here, CCF's medical personnel (1) "recognize[d] an inability to treat the patient due to the seriousness of the condition and . . . corresponding lack of expertise . . ." and sent Plaintiff off-site multiple times to various specialists; (2) regularly treated an obvious medical condition with visits to on-site and off-site medical personnel; and (3) provided attentive care and never merely "sen[t] the inmate back to his cell." *Self*, 439 F.3d at 1232. Plaintiff's Eighth Amendment claim fails.[4]

## C. Equal protection claim.

Plaintiff next alleges Defendants "failed to provide equal treatment to laws requiring prisoners receive adequate medical care and conditions of

---

[4] With respect to Plaintiff's claims regarding the actions of Warden Byrd, because Plaintiff has not shown an Eighth Amendment violation, the undersigned need not address his individual claims. In any event, Plaintiff neither avers nor shows Defendant Byrd acted with the requisite state of mind in directing and implementing any unconstitutional policies at CCF. *See e.g.*, *Davis v. Ark. Valley Corr. Facility*, 99 F. App'x 838, 843 (10th Cir. 2004) ("Copying [the Warden] with correspondence outlining his complaints about medical care, without more, does not sufficiently implicate Warden under § 1983."). Beyond a generalized statement that "CCA/CCF thru it's decisions, policies, procedures and actions failed to provide [him] with medical care" in violation of his constitutional rights, Plaintiff does not identify any policy the Warden directed and implemented. Doc. 1, at 9. Similarly, he has not shown that CCA has a custom or policy that can be said to have caused the alleged constitutional violations. *Smedley*, 175 F. App'x at 946.

confinement be maintained in a humane fashion." Doc. 1, at 7. He claims CCA "failed to provide proper and/or adequate medical care in refusing to follow specialists instructions, . . . intentionally delayed treatment for life threatening illness causing shortened life span and irre[parable] harm, pain." *Id.* at 8. He maintains that "[t]hru comparison to other similar illnesses of other prisoners . . . in the Oklahoma prison system, it can be shown I was not provided with equal treatment and proper or adequate medical care." *Id.* at 11.

This claim fails. Equal protection "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Where a classification targets a suspect class or involves a fundamental right, it must be "narrowly tailored to achieve a compelling governmental interest." *KT & G Corp. v. Attorney Gen. of Okla.*, 535 F.3d 1114, 1137 (10th Cir. 2008). If it does not, it need only be "rationally related to a legitimate government purpose." *Id*; *see, e.g., Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1322 n.10 (10th Cir. 2010) (religion); *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (race).

To violate the equal protection clause, state action must be motivated by an improper purpose, rather than merely having a disparate impact. *Washington v. Davis*, 426 U.S. 229, 239-42 (1976). Here, Plaintiff makes no factual allegations supporting his conclusory claim that the medical treatment or conditions at CCF violated the equal protection clause. He does not claim

to be a member of a suspect class, nor does he allege involvement of a fundamental right, nor does he claim that the medical care he received differed from that received by similarly situated prisoners at CCF. Therefore, his complaint fails to state a claim for violation of the equal protection clause regarding medical care.

## V. Recommendation and notice of right to object.

Plaintiff's diagnosis is dire, and no doubt the pain his cancer has caused is significant. But that alone does not amount to an actionable claim under § 1983. The undersigned recommends Defendants' motion for summary judgment be granted.

The undersigned advises Plaintiff of his right to file an objection to this Report and Recommendation with the Clerk of Court on or before August 29, 2017, under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). The undersigned further advises Plaintiff that failure to file a timely objection to this Report and Recommendation waives his right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in this matter.

**ENTERED** this 9th day of August, 2017.

_____
SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE